

# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | **WD85884** |
| **Respondent,** | ) | |
| **v.** | ) | **OPINION FILED:** |
| | ) | |
| **SCOTT ALAN SCHWARZ,** | ) | **September 24, 2024** |
| | ) | |
| **Appellant.** | ) | |
| | ) | |

**Appeal from the Circuit Court of Lafayette County, Missouri
The Honorable Dennis A. Rolf, Judge**

**Before Special Division:  Gary D. Witt, Presiding Judge,
Thomas N. Chapman, Judge, and Zel Fischer, Special Judge**

Scott Schwarz appeals his conviction following a jury trial for the class B felony driving while intoxicated, habitual offender.  He raises three points on appeal challenging evidentiary rulings by the trial court.  He contends that the trial court abused its discretion in allowing expert opinion testimony that he was intoxicated on gasoline; erred in excluding an eyewitness's statement to police that he believed Schwarz was suffering from drug abuse or mental illness; and erred in excluding Schwarz's statement to a law enforcement officer that he was suffering from mental health issues.  The judgment is affirmed.

## Factual and Procedural Background

Schwarz was charged as a habitual offender and a prior persistent felony offender with one count of the class B felony driving while intoxicated ("DWI") for operating a motor vehicle under the influence of a drug or drugs. At the beginning of trial, the trial court received evidence of Schwarz's prior convictions and found that he was an habitual offender due to his five prior intoxicated-related traffic offenses and a prior persistent offender based on three prior felony convictions. The following evidence was adduced at trial.[1]

On February 14, 2021, S.B. and his young son were returning to their home in Higginsville around 7:00 p.m. Their home is at the end of Chihuahua Road, a dead-end, gravel road off the south outer road, two miles from 13 Highway. The temperature that night was below zero; the outer roads were snow packed, and the main roads were clear. On their way home, S.B. and his son "[r]an into a white van who was turning circles" at the intersection of the outer road and H Highway. The driver of the van was later identified as Schwarz. S.B. flashed his lights at the van, and Schwarz pulled up so S.B. could go behind him. Schwarz then followed S.B., pulled into S.B.'s neighbor's driveway, and sat there with his headlights on for 15 minutes. S.B. and his son sat in their driveway keeping an eye on the van.

---

[1] In criminal cases, the appellate court views the evidence in the light most favorable to the jury verdict, disregarding all contrary evidence and inferences. *State v. Campbell*, 600 S.W.3d 780, 784 n.1 (Mo. App. W.D. 2020).

Schwarz then backed out of the neighbor's driveway and drove toward S.B.'s house. S.B. pulled out onto the road beside the van and asked Schwarz if he needed anything. Schwarz said that "somebody had messed up and didn't know who they were messing with." Schwarz's speech was "mumbled" and "slurred." S.B. drove back down Chihuahua Road, and Schwarz turned the van around and followed him. S.B. then drove to Casey's, and he and his son were there for about 25 minutes. On the way back home, S.B. again saw the white van stopped on the side of the outer road and Schwarz out in the field next to the road. When Schwarz saw the headlights of S.B.'s truck, he ran back to the van, grabbed a gas can from the driver's seat, and "stuck it to the side of the van." S.B. believed that Schwarz "stuck" the can to the sliding door on the side of the minivan, not in the fuel door. S.B. called the Sheriff's Department and "asked them why the gentleman was still out there."[2]

Higginsville Central Dispatch dispatched deputies to a location at Old 40 Highway and Chihuahua Road. Johnson County Sheriff's Deputy P.B. responded to the area and saw the white van traveling westbound on Old 40 Highway. It traveled over the center of the roadway into the deputy's eastbound lane. At least half of the van entered the deputy's lane. Deputy P.B. turned his patrol vehicle around and activated his lights and siren. Schwarz traveled a short distance before pulling partially into a driveway on the left side of the road with the rear portion of the van still in the roadway.

---

[2] S.B. testified that the phone call was the second call he made to the Sheriff's Department about Schwarz. No evidence was offered regarding his first phone call.

Deputy P.B. approached the van on the passenger side and contacted Schwarz. The deputy immediately smelled gasoline coming from inside the vehicle. Schwarz was holding a gas can above his lap near his stomach. He was "fidgeting" and his whole body was "twitching, moving around" "almost like it was uncontrollable." Deputy P.B. asked Schwarz for his driver's license and insurance. Schwarz did not respond, and the deputy asked a second time. Schwarz indicated that he was in Jefferson City. He then reached underneath the driver's seat, saying that was where his license was. The deputy asked Schwarz not to reach under the seat as a safety precaution and to exit the vehicle. Schwarz did not immediately follow the deputy's direction. After Deputy P.B. asked again, Schwarz exited the van and immediately opened up the sliding door on the driver's side and reached into the vehicle. Deputy P.B. asked him to stop reaching into the van a couple of times before Schwarz complied.

The deputy next asked Schwarz to walk to his patrol car. Schwarz had "trouble walking," was "stumbling," and seemed "like [he was] unsure where to put his feet down on the ground." He was not sliding on the snow but seemed "uncertain on his footing." Once in the patrol car, Deputy P.B. smelled an "overwhelming" odor of gasoline on Schwarz. He saw that Schwarz's eyes were red and bloodshot. Schwarz told the deputy that he was "in between Jefferson City and Rolla on 50 highway." He also indicated that he had gone to "Pick-n-Pull in Kansas City." Schwarz's speech was "mumbled" and "slurred." He spoke of "inappropriate" things such as "having sex and losing his virginity" and "being…in a fight or being beat up."

**4**

Deputy P.B. asked Schwarz to perform the horizontal gaze nystagmus test. After checking for equal tracking with both eyes, he attempted to test Schwarz for smooth pursuit on two passes. He, however, was only able to complete one pass because he was not able to hold Schwarz's attention. On the one pass completed, the deputy noticed a lack of smooth pursuit in both eyes. Deputy P.B. ended the test because of Schwarz's inattentiveness. Based on the report from dispatch and his own observations of Schwarz driving his vehicle, how he parked it, the smell of gasoline in Schwarz's car and on Schwarz in his patrol car, and Schwarz's eyes, "fidgety, twitchy, jerky motions," and statements during their interaction, the deputy determined that Schwarz was under the influence.

Missouri State Highway Patrol Trooper B.W. arrived to assist Deputy P.B. Schwarz granted the deputy permission to search his van. Deputy P.B. looked for Schwarz's license under the driver's seat, but did not find it. He found a second gas can in the cargo area of the van. There was a small amount of gasoline in both cans.

While the deputy searched Schwarz's vehicle, Trooper B.W. spoke with Schwarz in the deputy's patrol car. The trooper noticed an "overwhelming odor of gas" and that Schwarz's speech was "slurred" and "mumbled." Schwarz refused to perform any cognitive tests for the trooper such as saying the ABCs or counting.

Deputy P.B. decided to arrest Schwarz. He opened the passenger door of his patrol car and asked Schwarz to exit the car because he was under arrest. Schwarz did not respond. After receiving no response from Schwarz a second time, the deputy

**5**

grabbed Schwarz's right arm and tried to pull him out of the car, but Schwarz leaned farther into the car. Because Schwarz continued not to comply with the deputy's directions, Deputy P.B. and Trooper B.W. had to forcibly pull Schwarz out of the car, turn him around and pull his hands behind his back to place him in handcuffs, and put him in the backseat of the patrol car. During the drive to the Lafayette County jail, Schwarz's speech was "still mumbled and slurred," and he was speaking to himself about "random things."

Deputy P.B. read the Missouri Implied Consent to Schwarz and asked him to consent to a blood draw. Schwarz initially did not respond. The deputy asked if he understood what he had read to him, and Schwarz said, "In two months, in two months." Schwarz would not give the deputy a yes or no answer to whether he would consent to a blood draw but kept repeating, "In two months, in two months." During booking at the jail, Deputy P.B. asked Schwarz again if he would consent to a blood draw, and he answered no. The deputy asked him what should be done with a dog found in the van, and Schwarz said, "Leave that bitch in the fucking street."

Deputy P.B. explained during his testimony that he had received training on DWI investigations and standard field sobriety testing in the police academy. He had also attended an instructor's level course for the standard field sobriety testing and an intermediate level training course called Advanced Roadside Impairment Drug Enforcement ("ARIDE"). ARIDE teaches law enforcement officers to detect impaired driving, geared specifically towards drugs. Through the course, Deputy P.B. learned how

to identify drug impairment and how different drugs interact with the body. In his fifteen years in law enforcement and road patrol, he had arrested approximately 120 to 130 individuals for DWI and investigated hundreds more. Deputy P.B. explained that gasoline can be used, if inhaled, to alter one's state of mind. The common term for using gasoline is "huffing." He said that a person huffing gasoline would hold the container near their face or mouth and breath in.

Missouri State Highway Patrol Corporal R.H., a certified Drug Recognition Expert ("DRE"), testified as an expert witness at trial.[3] Corporal R.H. testified that he had been

---

[3] Prior to trial, Schwarz filed a motion to exclude the expert testimony of Corporal R.H. because his "testimony would be based on insufficient facts or data, based solely on hearsay, and be prejudicial." Schwarz conceded that the DRE process's acceptance by other courts under the *Daubert* test rendered it reliable under section 490.065.2, but he argued that the DRE process/exam, which consists of a 12-step protocol, was not completed by any witness in this case, therefore, the statutory requirements of section 490.065.2 were not satisfied. Specifically, he argued that the only facts available to Corporal R.H., who was not at the scene, were hearsay statements based on the observations of the two officers at the scene. He also argued that Corporal R.H.'s testimony would not be the product of reliable principles and methods and the corporal did not apply the principles and methods to the facts of the case because a DRE process/protocol/evaluation did not occur in this case. Schwarz thus asserted that Corporal R.H. should not be allowed to testify regarding the effects of any specific drug or an opinion as the effects of any drug, including inhalants, on Schwarz. A hearing was held on the motion, however, the trial court reserved ruling on the motion until trial.

Prior to the corporal's testimony at trial, Schwarz made an offer of proof regarding the reliability of his testimony. During the offer of proof, Corporal R.H. testified that he reviewed the probable cause statement and the reports of Deputy P.B. and Trooper B.W., that he did not speak to the arresting officers about this case, and that he did not write a report in this case. He explained that a DRE evaluation is a 12-step, systematic and standardized evaluation that a DRE would do if the DRE was "going to call a drug" or determine if a person is under the influence of a drug in a particular drug category. A DRE evaluation leads to a conclusion of either impairment or no impairment. An impairment conclusion is broken down to one of seven drug categories and also involves ruling out alcohol or medical issue impairment. The 12-step process includes an eye examination (horizontal gaze nystagmus, vertical gaze nystagmus, and lack of conversions evaluation) and psycho-physical tests (walk and turn test, stand on one leg test, taking person's pulse three times, taking person's blood pressure, and pupil evaluation in

7

trained on alcohol and drug impairment including field sobriety testing for basic recruits, the ARIDE course, and the DRE course. He also testified that since 2018, he has been the Highway Patrol's trainer on alcohol and drug impairment, teaching all of these classes. Corporal R.H. explained that the two-day, 16-hour ARIDE course teaches officers to recognize drug impairment (versus alcohol impairment) and how to administer and interpret field sobriety tests on those individuals. He said that an officer generally does not have "to call a specific drug in order to find drug impairment." Once an officer recognizes drug impairment, they are encouraged to call a DRE to confirm. The next level DRE course teaches officers to recognize the physiological effects of a particular drug on the human body. It teaches "about different drugs, what they do to the human body, how to recognize what the drugs are causing." Corporal R.H. testified that he is "the subject matter expert as deemed by the State on these topics" and that he also uses his skills in the field. The prosecutor then asked Corporal R.H. the following:

> Q: Okay. And so as DRE and in your current position, when officers

---

different lighting conditions). Corporal R.H. testified that no DRE evaluation was conducted in this case by him or the officers at the scene. He stated that he did not do a DRE evaluation of Schwarz and was basing his conclusions on the arresting officers' reports. Finally, he testified that he was not only trained "to call a drug category" based on the 12-step DRE evaluation but to also "come to a conclusion" based on "other general indicators."

Schwarz also made an offer of proof regarding Schwarz's possible mental illness. During the offer of proof, Corporal R.H. testified that when he was reviewing Deputy P.B.'s report, he learned that Schwarz had told the deputy that he had bipolar disorder and schizophrenia and that he was not taking his medication. He also stated that mental illness could sometimes mimic drug intoxication, that a symptom of schizophrenia could be that a person is out of touch with reality, and that talking softly and mumbling could be an indicator of drug use or mental illness. Schwarz argued that this testimony was relevant because statements regarding his mental illness were included in reports the corporal reviewed as a potential expert witness.

provide you materials after the fact, even though you didn't have anything to do with the case as it stood on the night of the incident, do you have any abilities to do anything on those set of facts?

A: Yes. So it's really, I mean, easy. So imagine that I go, there is an animal, it has got four legs, it has got fur, it has got two eyeballs, two ears. We eat it on hamburgers and we milk it. Probably everybody in the room goes, Oh, that is a cow. Even though you didn't actually see the cow and do a full veterinary examination on that cow, we all go, That is a cow. So if we see certain indicators or impairment, i.e., the utter, the horns, all that stuff, we can link that to specific drug use as well. If that kind of makes sense.

Corporal R.H. continued explaining that every drug has predictable, impairing effects on the body and based on those effects, drugs are placed into certain categories. He said that gasoline falls into one of the drug categories. Schwarz's attorney objected to the foundation for the expert witness's testimony. He argued that under the *Daubert* factors,[4] there was no DRE protocol applied to the facts of the case and thus no validation for the work the corporal did. He argued that while the corporal "can probably testify as to if there is the existence of impairment," he cannot get into any drug or class of drugs. The trial court overruled Schwarz's objection, finding that the question of whether gasoline falls within a category of a drug was a legitimate question based upon the corporal's training and experience. Corporal R.H. explained that gasoline falls under the inhalant category of drugs and under the subcategory of volatile solvents. Some of the physiological effects caused by inhaling gasoline are confusion, disorientation, lack of

---

[4] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**9**

muscle control, bloodshot and watery eyes, and an overwhelming odor on the person. He said that the impairment mimics alcohol impairment but "to a whole other level." He further explained that because gasoline is clear and evaporates, it would not be visible on the person who inhaled it like a substance such as paint might be.

Finally, the prosecutor asked Corporal R.H. if, based on his policies and procedures, he could make a conclusion based on other officers' reports, and he answered yes. When asked what his conclusion was in this case, Schwarz's attorney objected based on lack of foundation for the expert testimony, specifically that the testimony was not based on a reliable method. Again, he conceded that the corporal could testify "through his observations if he saw drug impairment." The trial court overruled Schwarz's objection. Corporal R.H. concluded, "Based on everything that Deputy [P.B.] wrote and what he said that Trooper [B.W.] wrote, it appears to me that it would be inhalant. Of course, gasoline being the main substance that was on the scene. So an inhalant intoxication." The corporal again explained that a specific drug does not have to be named to conclude an impairment, "There is a difference between a DRE call and a conclusion, right? So no, if the impairment is there, we can still conclude that that is what it is."

The jury found Schwarz guilty of one count of driving while intoxicated. The trial court sentenced Schwarz as a habitual offender and a prior persistent offender to 20 years' imprisonment. This appeal by Schwarz followed.

**Admission of Expert Testimony**

In his first point on appeal, Schwarz contends that the trial court erred in allowing Corporal R.H. to testify as an expert. He argues that the corporal's testimony was not based on reliable principles and methods and there was no application of the reliable principles and methods to the facts of this case.[5] In the argument section of his brief, Schwarz specifically challenges Corporal R.H.'s testimony that Schwarz was under the influence of gasoline as inadmissible. He asserts that the corporal's conclusion was not reliable because no officer conducted the 12-step DRE evaluation of Schwarz, Corporal R.H. did not personally observe Schwarz, and his conclusion was based only on Deputy P.B.'s and Trooper B.W.'s observations and reports. Schwarz does not challenge the corporal's general testimony regarding the effects of intoxicating inhalants in his initial appellant's brief.

A trial court has broad discretion to admit or exclude evidence at trial, and its admission or exclusion of expert testimony is reviewed for an abuse of discretion. *State*

---

[5] Schwarz's first point on appeal is deficient under Rule 84.04. "Rule 84.04 plainly sets forth the required contents of briefs filed in all appellate courts." *City of St. Louis v. State*, 682 S.W.3d 387, 397 n.7 (Mo. banc 2024) (internal quotes and citation omitted). "These requirements are mandatory." *Id.* (internal quotes and citation omitted). Point one does not follow the structure for points relied on set out in Rule 84.04(d)(1) because it fails to "[e]xplain in summary fashion why, *in the context of the case*, those legal reasons support the claim of reversible error." Rule 84.04(d)(1)(C) (emphasis added). An appellate court has discretion to review deficient points *ex gratia* where the argument is readily understandable. *City of St. Louis*, 682 S.W.3d at 397 n.7; *In re S.M.W.*, 658 S.W.3d 202, 212-13 (Mo. App. W.D. 2022). Here, Schwarz's argument is readily understandable, therefore, this court cautiously exercises its discretion to decide the point on the merits "because each time we review a noncompliant brief *ex gratia*, we send an implicit message that substandard briefing is acceptable. It is not." *City of St. Louis*, 682 S.W.3d at 397 n.7 (internal quotes and citation omitted).

*v. Minor*, 648 S.W.3d 721, 733 (Mo. banc 2022); *State v. Loper*, 609 S.W.3d 725, 735 (Mo. banc 2020). A trial court abuses its discretion only if its decision is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. *Minor*, 648 S.W.3d at 733. Review of an evidentiary issue on direct appeal is for prejudice, not mere error. *Id.* "The admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id.* (internal quotes and citations omitted).

Section 490.065.2(1), RSMo Cum. Supp. 2023, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case[.]

An expert may base his opinion on "facts or data in the case that the expert has been made aware of or personally observed." § 490.065.2(2).

Section 490.065.2(1) mirrors Federal Rule of Evidence 702, which "affirms the trial court's role as gatekeeper and provides some general standards that the trial court

must use to assess the reliability and helpfulness of proffered expert testimony." *State v. Marshall*, 596 S.W.3d 156, 159 (Mo. App. W.D. 2020) (internal quotes and citations omitted). This gatekeeping function involves a three-part test: (1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable. *Id.*

Schwarz concedes on appeal that Corporal R.H. was qualified as an expert within the meaning of section 490.065.2(1).[6] Additionally, he does not assert on appeal that the corporal's conclusion that he was under the influence of an inhalant, specifically gasoline, was not relevant. In fact, during his objection at trial, he conceded that the corporal's testimony would be helpful to the trier or fact. Rather, his argument is focused on the reliability of the corporal's conclusion under subsections (b), (c), and (d) of section 490.065.2(1). He claims it was not based on sufficient facts or data, reliable principles and methods, or reliable application thereof, specifically because the 12-step DRE protocol was not performed on Schwarz and the conclusion was based only on Deputy P.B.'s and Trooper B.W.'s observations and reports.

The State correctly asserts that the corporal's general testimony about the effects

---

[6] The dissent does not argue that Corporal R.H. was not qualified as an expert within the meaning of section 490.065.2(1), recognizing that the corporal testified as to his training on recognizing drug impairment and how he teaches other officers to recognize the effects of drugs on a person. It correctly observes that the only foundational requirements challenged in this appeal are section 490.065.2(1)(c) and (d), whether the Corporal R.H.'s expert testimony as to Schwarz's drug intoxication due to inhalation of gasoline fumes was based on reliable principles and methods that were reliably applied.

of intoxicating inhalants was admissible.[7]  Where an expert offers non-scientific,

generalized testimony based on specialized knowledge rather than on strictly "scientific"

knowledge, a different reliability analysis is appropriate.  *Marshall*, 596 S.W.3d at 160-

61.

> If the expert purports to apply principles and methods to the facts of the
> case, it is important that this application be conducted reliably.  Yet it might
> also be important in some cases for an expert to educate the factfinder about
> general principles, without ever attempting to apply these principles to the
> specific facts of the case.  For example, experts might instruct the factfinder
> on the principles of thermodynamics, or bloodclotting, or on how financial
> markets respond to corporate reports, without ever knowing about or trying
> to tie their testimony into the facts of the case.  The amendment does not
> alter the venerable practice of using expert testimony to educate the
> factfinder on general principles.  For this kind of generalized testimony,
> Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony
> address a subject matter on which the factfinder can be assisted by an
> expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of
> the case.

*Id.* (quoting Advisory Committee Note to FED. R. EVID. 702 (2000)).  The ultimate

inquiry regarding reliability remains that set out in section 490.065.2, i.e. testimony is

reliable if it is based on sufficient facts or data, reliable principles and methods, and

---

[7] The dissent wrongly indicates that this majority opinion suggests that Corporal R.H. was "providing primarily non-specific, generalized testimony."  The majority makes no such characterization of the corporal's testimony.  Corporal R.H.'s testimony consisted of both general testimony regarding the effects of intoxicating inhalants and a specific conclusion that Schwarz was under the influence of gasoline.  While Schwarz objected at trial to both the corporal's general testimony and his specific conclusion, as noted above, his point relied on fails to distinguish which part of the corporal's testimony was objectionable and his argument is focused only on the specific conclusion.  As will be explained in detail below, this majority opinion holds that the corporal's general testimony was admissible, and does not address the admissibility of the specific conclusion because, even if it was not admissible, its admission did not result in prejudice.

reliable application of those principles. *Id.* at 161. "[A]n expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Id.* (internal quotes and citation omitted). As long as an expert's testimony rests upon good grounds based on what is known, the testimony should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset. *Id.*

Here, good grounds existed for admitting Corporal R.H.'s general testimony regarding the effects of inhalant intoxication. The corporal generally explained that gasoline falls under the inhalant category of drugs and that some of the physiological effects caused by inhaling gasoline are confusion, disorientation, lack of muscle control, bloodshot and watery eyes, and an overwhelming odor of gasoline on the person. He also said that the impairment mimics alcohol impairment but "to a whole other level." The general types of effects of inhalant intoxication discussed by Corporal R.H. described behaviors similar to those exhibited by Schwarz at the scene of his arrest, such as fidgety and uncontrollable movements, stumbling, red, bloodshot eyes, slurred speech, confusion, and an overwhelming smell of gasoline on his person. Thus, the corporal's testimony was relevant and would have assisted the jury.[8] Moreover, his general

---

[8] *Cf. State v. Jones*, 322 S.W.3d 141, 144-45 (Mo. App. W.D. 2010) (exclusion of expert testimony as to general effects of alcohol and cocaine was not an abuse of discretion in prosecution for second-degree murder and armed criminal action, even though victim had consumed alcohol and cocaine before his death, where testimony of expert would not have assisted jury and would have only diverted the jury's attention from the relevant issues because there was no evidence that victim displayed any of the symptoms of instability or impairment described by the expert).

15

testimony was reliable. Corporal R.H.'s testimony was based on his extensive, specialized training on alcohol and drug impairment including field sobriety testing for basic recruits; the ARIDE course, which teaches officers to recognize drug impairment (versus alcohol impairment) and how to administer and interpret field sobriety tests on those individuals; and the DRE course, which teaches officers to recognize the physiological effects of a particular drug on the human body. Not only did the corporal receive this training, he now teaches these courses to other officers and uses the skills learned in them in the field. He is also considered by the State to be the subject matter expert on the topic. Additionally, Corporal R.H. has personal experience with inhalant intoxication. He explained that he had encountered one woman who had been huffing gasoline and that "she was by far the most impaired person [he had] ever personally dealt with" and that it had taken hours "for her to come back around." "There is nothing per se unreliable about testimony based on personal observations made in the course of an expert's professional experiences." *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 321 (Mo. App. E.D. 2018). The trial court did not abuse its discretion in allowing Corporal R.H. to provide general testimony about the effects of intoxicating inhalants based on his extensive training and experience.

Regarding Corporal's R.H.'s specific conclusion that Schwarz was under the influence of gasoline, even if the trial court erred in admitting this testimony (which we

**16**

need not and do not decide), the admission of the testimony did not result in prejudice.[9] Corporal R.H.'s opinion that Schwarz was under the influence of gasoline was not necessary for the State to prove that he was driving while intoxicated. When considered with and balanced against all of the other evidence properly admitted at trial establishing that Schwarz was driving while under the influence of inhaled gasoline, there is no reasonable probability that the jury would have reached a different conclusion without Corporal R.H.'s opinion.

"A person commits the offense of driving while intoxicated if he or she operates a vehicle while in an intoxicated condition." § 577.010.1, RSMo 2016. "Intoxicated condition" is defined as "when a person is under the influence of alcohol, a controlled substance, or drug, or any combination thereof[.]" § 577.001(13), RSMo 2016. "Intoxication under Missouri's statute requires proof that the consumption of alcohol or drugs interferes or impairs the defendant's ability to properly operate an automobile." *State v. Rigsby*, 589 S.W.3d 661, 666 (Mo. App. W.D. 2019) (quoting *Rocha v. Dir. of Revenue*, 557 S.W.3d 324, 327 (Mo. App. W.D. 2018) (citing *State v. Schroeder*, 330 S.W.3d 468, 475 (Mo. banc 2011)).

---

[9] This opinion in no way addresses whether Corporal R.H.'s testimony that Schwarz was under the influence of gasoline was reliable under section 490.065.2(1)(c) and (d) and thus admissible where no officer conducted the 12-step DRE evaluation of Schwarz, Corporal R.H. did not personally observe Schwarz, and his conclusion was based only on Deputy P.B.' and Trooper B.W.'s observations and reports.

The proof necessary to establish driving under the influence of drugs should be no different than that to make a case for driving under the influence of alcohol, other than the evidence must relate to the particular substance involved. *State v. Meanor*, 863 S.W.2d 884, 888 (Mo. banc 1993); *State v. Friend*, 943 S.W.2d 800, 802 (Mo. App. W.D. 1997). Thus, where there is evidence that a person has recently consumed alcohol and/or drugs and is then observed exhibiting signs of impaired judgment and motor skills consistent with intoxication, it can be concluded that the alcohol and/or drugs caused the impairment. *Id.* Whether a person operated a motor vehicle under the influence of alcohol and/or a drug may be proven through direct or circumstantial evidence. *Meanor*, 863 S.W.2d at 888. Circumstantial evidence is evidence that does not directly prove a fact but gives rise to a logical inference that the fact exists. *State v. Putney*, 473 S.W.3d 210, 216 (Mo. App. E.D. 2015).

While the effects of excessive alcohol consumption are well-known and relatively easy to identify, drug impairment is different. *Secrist v. Treadstone, LLC*, 356 S.W.3d 276, 281 (Mo. App. W.D. 2011); *Friend*, 943 S.W.2d at 802. "Different drugs have varying effects on behavior" and "do not necessarily produce readily recognizable symptoms and behavior patterns." *Id.* Thus, "the behavior, which evidences impaired judgment and motor skills, must be consistent with the symptoms of the ingested drug." *Friend*, 943 S.W.2d at 802.

Even without Corporal R.H.'s conclusion that Schwarz was under the influence of gasoline, other evidence supported a logical inference that Schwarz was in an intoxicated

condition (under the influence of a drug) while operating his van. S.B. observed Schwarz turning circles in an intersection and then following him first to his house and then back out of his neighborhood. When S.B. spoke to Schwarz briefly, Schwarz's speech was mumbled and slurred. S.B. saw Schwarz again on the side of the road after returning home from Casey's, purportedly trying to fill his tank through the side, sliding door of the van. After receiving the call from dispatch, Deputy P.B. observed Schwarz traveling over the center line of the roadway and then parking his van in a driveway with the rear portion of it still in the roadway. When he was pulled over by the deputy, Schwarz was found in the driver's seat holding a gas can above his lap near his stomach and with an overwhelming odor of gasoline on his person. A second gas can was found in the van, and both cans had a small amount of gas in them. Schwarz was fidgeting and his whole body was twitching uncontrollably. He had trouble walking and stumbled to the deputy's patrol car. He was not slipping or sliding on the snow, but was uncertain on his footing. His eyes were red and bloodshot, and his speech was mumbled and slurred. Schwarz would not follow the deputy's instructions when he asked for his license and when he told Schwarz not to reach under his seat or inside the van. He spoke of inappropriate, random things, such as having sex, losing his virginity, and being beaten up. He did not know where he was, saying that he had gone to Kansas City, that he was in Jefferson City, and that he was in between Jefferson City and Rolla on 50 Highway. Deputy P.B. attempted to perform the horizontal gaze nystagmus test, but was only able to complete one pass because he could not hold Schwarz's attention. On the one pass completed, the

**19**

deputy noticed a lack of smooth pursuit in both eyes. Trooper B.W. also observed an overwhelming smell of gasoline on Schwarz, his slurred and mumbled speech, and his refusal to perform any cognitive tests.

Deputy P.B., who had completed the ARIDE course and had learned how to identify drug impairment and how different drugs interact with the body and who had arrested over 120 individuals for DWI, knew that gasoline can be used, if inhaled, to alter one's state of mind. He testified, without objection, that based on his observations of Schwarz, including the smell of gasoline on his person, he believed Schwarz was under the influence. "[A] law enforcement officer is allowed to testify as to his observations and opinions regarding intoxication." *State v. Hoy*, 219 S.W.3d 796, 810 (Mo. App. S.D. 2007). Furthermore, and importantly, Schwarz's condition and behavior were consistent with identifiable symptoms of ingestion of gasoline described by Corporal R.H. such as confusion, disorientation, lack of muscle control, bloodshot eyes, and an overwhelming odor on the person, which as discussed above was properly admitted. From all of this evidence, a reasonable inference could be made that Schwarz was impaired from the ingestion of gasoline even without Corporal R.H.'s specific conclusion.[10] There is no reasonable probability that the jury would have reached a different conclusion about

---

[10] *Cf. Friend*, 943 S.W.2d at 803 (although defendant drove on wrong side of highway and exhibited bizarre behavior and tests of blood sample showed presence of methamphetamine, evidence was insufficient to sustain conviction for DWI because there was no evidence to show that defendant's behavior was consistent with identifiable symptoms of ingestion of meth and no evidence that the level of meth was sufficient to impair his driving ability).

Schwarz's intoxication without Corporal R.H.'s opinion that he was under the influence of gasoline.[11]  *Minor*, 648 S.W.3d at 733.  The admission of the evidence, therefore, did not result in prejudice.[12]

Point one is denied.

## Exclusion of Eyewitness's Statement to Law Enforcement

In his second point on appeal, Schwarz contends that the trial court abused its discretion in excluding S.B.'s statement during his phone call to the Sheriff's Department that he thought Schwarz was either under the influence of a drug or having mental problems.  He argues that S.B.'s statement was admissible under the present sense impression exception to the rule against hearsay.

The State asserts that this claim of error was not preserved for review because

---

[11] The dissent incorrectly argues that this majority opinion conducts a sufficiency of the evidence analysis rather than a prejudice analysis.  As noted above, the prejudice analysis for the erroneous admission of evidence requires the appellate court to determine whether "the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error."  *Minor*, 648 S.W.3d at 733 (internal quotes and citations omitted).  This opinion considers and balances all of the other evidence properly admitted at trial establishing that Schwarz was driving while under the influence of inhaled gasoline and concludes that there is no reasonable probability that the jury would have reached a different conclusion without Corporal R.H.'s opinion.

[12] In stating that Schwarz was prejudiced by the admission of Corporal R.H.'s conclusion that he was under the influence of gasoline, the dissent speculates that Schwarz could have been shivering from the cold and not fidgeting or twitching, that he smelled of gasoline because gasoline spilled or leaked on his clothing when he attempted to refuel his van, and that his eyes were red because he was sitting in an enclosed vehicle with an open gas container and gasoline on his clothes.  Defense counsel in fact made such arguments during closing argument, but the jury apparently chose not to believe these explanations for Schwarz's behavior.

Schwarz did not argue to the trial court that this evidence was admissible as a present sense impression. "To preserve a claim of error, counsel must object with sufficient specificity to apprise the trial court of the grounds for the objections." *State v. Amick*, 462 S.W.3d 413, 415 (Mo. banc 2015) (internal quotes and citation omitted). "In the context of preserving for appellate review alleged error in the trial court's exclusion of proffered evidence, a defendant's theory of admissibility 'must be presented to or decided by the trial court.'" *State v. Thomas*, 590 S.W.3d 441, 445 (Mo. App. S.D. 2019) (quoting *State v. Blurton*, 484 S.W.3d 758, 778 (Mo. banc 2016)). Additionally, "[a]n issue is not preserved for appellate review if the issue is not included in the motion for a new trial." *State v. Wood*, 580 S.W.3d 566, 578 (Mo. banc 2019) (internal quotes and citation omitted)). "A point is preserved for appellate review only if it is based on the same theory presented at trial." *State v. Rice*, 573 S.W.3d 53, 63 (Mo. banc 2019) (internal quotes and citation omitted).

Prior to trial, the State filed a motion in limine, in part, to prohibit any evidence concerning Schwarz's "medical diagnoses." It argued that while a lay witness may testify as to their observations about the appearance and symptoms experienced, they are not qualified to express an opinion as to whether a person had a specific medical diagnosis. At a pretrial hearing, defense counsel stated that he had "no objection" to the State's motion in limine on this issue, and the trial court granted the motion.

After S.B's testimony, defense counsel made an offer of proof regarding a statement he made in his call to the Sheriff's Department:

**22**

Q: [S.B.], I'm going to ask you some questions about the reasons why you called the Sheriff's office and about some of the odd actions you saw this man doing.

A: Okay.

Q: When you called the police station you told them you thought you saw a man who was either under the influence of a drug, right?

A: Correct.

Q: Or having mental problems?

A: Correct.

Q: All right. You called the Sheriff's office twice about that, correct?

A: Correct.

Defense counsel argued that the evidence was "relevant to [S.B.'s] observations upon seeing this man" and that it "was not a specific medical diagnosis that has been ruled on in the motion in limine." He also argued that the State "opened the door" by asking S.B. if Schwarz was "acting odd." The trial court excluded the evidence, ruling "I'm still not going to allow him to testify that he was having mental health issues." In his motion for new trial, Schwarz again argued that the trial court's exclusion of S.B.'s statement was "relevant to his own observation about [Schwarz's] behavior."

Defense counsel did not argue to the trial court that S.B.'s hearsay statement to law enforcement was admissible as a present sense impression, and the trial court did not decide that issue. Instead, at trial and in his motion for new trial, defense counsel argued only that the statement was relevant. Schwarz failed to preserve this point for appellate

review.[13]

Generally, an appellate court does not review unpreserved claims of error. *State v. Brandolese*, 601 S.W.3d 519, 525-26 (Mo. banc 2020). Rule 30.20, however, provides an appellate court discretion to review "plain errors affecting substantial rights…when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Plain error review is discretionary, and [an appellate court] will not review a claim for plain error unless the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Brandolese*, 601 S.W.3d at 526 (internal quotes and citations omitted). "The plain error rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *Id.* (internal quotes and citation omitted). To obtain a new trial on direct appeal based on a claim of plain error, the defendant must show that the error was outcome determinative. *State v. Mills*, 687 S.W.3d 668, 675 (Mo. banc 2024).

Schwarz has failed to demonstrate that the trial court's exclusion of S.B.'s statement during a phone call to the Sheriff's Department lead to manifest injustice warranting plain error review. Even if the statement was admissible as a present sense

---

[13] The dissent states that evidence of Schwarz's possible mental illness should have been admitted because it was relevant to its effect on the arresting officers' actions and impact on the process of determining whether Schwarz was intoxicated. While Schwarz briefly argued at trial that such evidence was relevant because it was included in reports Corporal R.H. reviewed as a potential expert witness, he did not raise or make such argument on appeal. Arguments not raised on appeal are abandoned. *Johnson v. State*, 580 S.W.3d 895, 899 n.4 (Mo. banc 2019).

impression (which we need not and do not decide), Schwarz cannot show that exclusion of the evidence was outcome determinative. As detailed in point one above, there was overwhelming evidence of Schwarz's guilt of driving while intoxicated that would not have been overcome by S.B.'s statement. When Deputy P.B. stopped Schwarz for driving erratically, he was found in the driver's seat holding a gas can above his lap and with an overwhelming odor of gasoline on his person. He demonstrated numerous physical indicators of impairment such as fidgeting, twitching, stumbling as he walked, red and bloodshot eyes, and mumbled and slurred speech. Additionally, he was confused and would not follow instructions. Schwarz's condition and behavior were consistent with identifiable symptoms of ingestion of gasoline. We cannot say that had the jury been given S.B.'s statement to the Sheriff's Department, it would have reached a different result. Furthermore, Schwarz does not explain how the exclusion of the statement, which could also be construed to support the State's case—that he was intoxicated—resulted in manifest injustice. Schwarz has not met his burden of demonstrating facially substantial grounds for believing that exclusion of the statement resulted in manifest injustice or miscarriage of justice. We exercise our discretion to decline plain error review of this point.

Point two is denied.

**Exclusion of Schwarz's Statements to Law Enforcement**

In this last point on appeal, Schwarz contends that the trial court abused its discretion in excluding his statements to Deputy P.B. that he was suffering from mental

**25**

health issues and was not taking his medication. He argues that the statements were admissible under the rule of completeness. Again, the State contends that this claim of error was not preserved for appellate review because Schwarz did not present the rule of completeness theory of admissibility to the trial court. As discussed in point two, to preserve a claim related to the exclusion of evidence, the defendant's theory of admissibility must be presented to and decided by the trial court. *Thomas*, 590 S.W.3d at 445 (Mo. App. S.D. 2019). The issues must also be included in the motion for new trial. *Wood*, 580 S.W.3d at 578.

In its motion in limine filed before trial, the State sought to prohibit any evidence of self-serving statements made by Schwarz denying the offense, specifically statements made to law enforcement during the DWI investigation regarding a diagnosis for mental health disorders. At the pretrial hearing, defense counsel argued that several exceptions to the hearsay rule applied including "then existing mental or physical condition, state of mind, present sense impression, even res gestae" and, therefore, Schwarz's statements were admissible. The trial court granted the State's motion in limine on the issue.

Prior to Deputy P.B.'s testimony at trial, defense counsel made an offer of proof to admit statements made by Schwarz to the deputy "in response to the officer's questions about if he had any mental problems." During the offer of proof, Deputy P.B. testified that he asked Schwarz if he had any issues and Schwarz told him that he had bipolar

disorder and schizophrenia and he was supposed to be taking medication but was not.[14]

Defense counsel argued that the statements to Deputy P.B. were relevant and not self-serving or hearsay and, thus, admissible. He also argued they were admissible under the res gestae and then existing mental condition or state of mind exceptions to the hearsay rule. The prosecutor replied that the statements were self-serving hearsay. As with its ruling on the State's motion in limine, the trial court again sustained the State's hearsay objection and prohibited admission of the evidence.

In this motion for new trial, Schwarz argued that the trial court erred to his prejudice in excluding his statements to the deputy because "[a] central fact of the defense was [Schwarz's] seemingly odd behaviors were a result of unmedicated mental illnesses and/or symptoms due to unmedicated bipolar disorder and schizophrenia." He asserted that exclusion of his statements to Deputy P.B. "violated [his] rights to a fair trial by an impartial jury, to confrontation, to effective assistance of counsel and to due process."

Defense counsel did not argue to the trial court during trial or in this motion for new trial that Schwarz's statements to Deputy P.B. were admissible under the rule of completeness, and the trial court did not rule on that issue. He failed to preserve the issue

---

[14] Other than Corporal R.H.'s testimony during an offer of proof that (unspecified) mental illness could sometimes mimic drug use and that a person who is diagnosed with schizophrenia may be out of touch with reality, no evidence was presented, either in an offer of proof or otherwise, regarding the symptoms or behaviors associated with unmedicated bipolar disorder and schizophrenia, and whether such behaviors mimic drug intoxication, or, specifically, mimic the behaviors exhibited by Schwartz.

for appellate review.[15] An appellate court "will not review a claim for plain error unless the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Brandolese*, 601 S.W.3d at 526 (internal quotes and citations omitted).

Again, Schwarz has failed to demonstrate that the trial court's exclusion of his statements to Deputy P.B. lead to manifest injustice warranting plain error review. Even if the statement was admissible under the rule of completeness (which we need not and do not decide), Schwarz cannot show that exclusion of the evidence was outcome determinative. Just as in point two, the overwhelming evidence of Schwarz's guilt would not have been overcome by his statements to the deputy. Schwarz has not met his burden of demonstrating facially substantial grounds for believing that exclusion of the statements resulted in manifest injustice or miscarriage of justice. We exercise our discretion to decline plain error review of this point.

Point three is denied.

---

[15] Again, the dissent states that evidence of Schwarz's possible mental illness should have been admitted (through his own out-of-court statements and the lay observations of S.B.) because it was relevant to its effect on the arresting officers' actions and impact on the process of determining whether Schwarz was intoxicated. Schwarz, however, does not make such argument on appeal, and it is abandoned. *Johnson*, 580 S.W.3d at 899 n.4. Other than Corporal R.H.'s testimony in an offer of proof that a person who is diagnosed with schizophrenia may be out of touch with reality, no evidence was presented regarding the symptoms or behaviors associated with unmedicated bipolar disorder and schizophrenia and whether those specific mental conditions mimic intoxication. Even if Schwartz had not abandoned on appeal the dissent's basis for the admission of his purported mental conditions, and if that basis had merit (which we do not address), Schwarz simply fails to show how his purported mental state could explain the numerous physical indicators of impairment that he demonstrated.

**Conclusion**

The judgment is affirmed.

_Tom Chapman_
_____
Thomas N. Chapman, Judge

Thomas Chapman, Judge, writes for the majority.
Zel Fischer, Special Judge, concurs in majority opinion.
Gary Witt, Presiding Judge, dissents in separate dissenting opinion.



## Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | **WD85884** |
| Respondent, | ) | |
| v. | ) | **FILED: September 24, 2024** |
| | ) | |
| SCOTT ALAN SCHWARZ, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

### DISSENTING OPINION

I respectfully dissent. In this case the State offered and the trial court erroneously admitted the expert DRE opinion testimony when the 12-step protocol for a DRE evaluation was not completed by either the expert or the arresting officers. I would reverse on that basis. I would also note that the trial court plainly erred in disallowing evidence of Schwarz's possible mental illness in that it was not hearsay and should have been admitted on the basis that it was relevant as to its effect on the arresting officers' actions and impact on the process of determining whether Schwarz was intoxicated. Because these issues are interrelated, they are addressed together.

Section 577.010 states that "[a] person commits the offense of driving while

1

intoxicated if he or she operates a vehicle while in an intoxicated condition."  Intoxication

may be from alcohol or other drugs.  "Intoxication consists of three components:

impaired ability, presence of a proscribed substance in the defendant's body at the time of

the offense, and a causal connection between the proscribed substance and the

defendant's impaired ability." *State v. Pickering*, 473 S.W.3d 698, 704 (Mo. App. W.D.

2015) (quoting *State v. Pilant,* 437 S.W.3d 838, 839 (Mo. App. S.D. 2014)).  Unlike

alcohol, where a presumption of intoxication is created when a driver's blood has a

concentration of alcohol of .08 percent or higher, intoxication resulting from other drugs

requires additional proof.  *See* section 577.012.1(1).

Drug recognition evaluators ("DRE") are specially trained law enforcement

officers whose extra training qualifies them to examine people, through the use of a

specific twelve-step protocol established through the National Highway Traffic Safety

Administration ("NHTSA") in conjunction with the Los Angeles Police Department, and

opine as to whether a driver is impaired due to the ingestion or consumption of one or

more of seven different categories of drugs.  H. Morley Swingle, *Drug Recognition*

*Experts in Missouri*, 66 J. MO. BAR 250, 250-51 (Sept./Oct. 2010).  A DRE's opinions are

based "upon observations of certain characteristics [that] are known to be exhibited by an

individual who is under the influence of a specific category of controlled substances."

*State v. Savick*, 347 S.W.3d 147, 152 (Mo. App. S.D. 2011).  The twelve steps of the

DRE protocol include:

(1) administer a breath alcohol test;

(2) interview the arresting officer;
(3) conduct a preliminary examination of the individual to rule out alcohol **or medical impairments**;
(4) administer an HGN test;
(5) administer the Romberg balance, walk-and-turn, one-leg stand, and finger-to-nose tests;
(6) take the individual's vital signs, including pulse, blood pressure, and temperature;
(7) examine the individual's eyes with a penlight in a dark room;
(8) examine the inside of the individual's nose and mouth;
(9) examine the individual's muscle tone;
(10) interview the individual;
(11) form an opinion regarding whether the individual is under the influence of a particular category of controlled substances; and
(12)  request a urine sample for toxicological analysis.

*Savick*, 347 S.W.3d at 152 (emphasis added).

"This process is a systematic, standardized method of examining a suspect to determine whether a suspect is impaired by one or more categories of drugs.  The Twelve Step Test is a systematic process because it is based on a variety of observable signs and symptoms [that] are known to be reliable indicators of drug impairment.  The procedure is standardized in that it is conducted the same way for every suspect."  Scott Brown, *The D.R.E.: Drug Recognition Expert or Experiment?*, 69 UMKC L. REV. 557, 559 (Spring, 2001) (internal quotation marks and citations omitted).

The Southern District of this Court warned about the dangers of labeling a DRE witness an expert, particularly when the proper protocol was not followed, in *State v. Hoy*, 219 S.W.3d 796, 799 n.2 (Mo. App. S.D. 2007).  In that case, the Court stated:

We note that a witness is not considered an "expert" witness unless and until a proper foundation has been laid as to his qualifications.  It has been suggested that a more appropriate title would be drug recognition examiner

or evaluator. *Williams v. State*, 710 So.2d 24, 37 n. 23 (Fla. App. 3 Dist., 1998). In the instant case, we are confident that the trial court [the finder of fact in this non-jury case] was not confused or misled by the use of the title "drug recognition expert." However, we have concerns that the use of this title could possibly confuse or mislead a jury.

*Id.*

Other courts have ruled similarly. In *State v. Aman*, 95 P.3d 244, 248 (Or. Ct. App. 2004), the Court of Appeals of Oregon found that DRE testimony could not be used as scientific evidence even when eleven of the twelve DRE steps had been properly completed. The court stated, "The issue is not whether the administration of an 11-step test in this case showed that defendant was impaired. The question, rather, is whether the test *as given* meets the standards for valid scientific evidence that properly could be presented as such to a jury." *Id.* In another case, the same court held that even if all other steps of the protocol are properly completed, "the urinalysis is indispensable," and if a confirmatory urinalysis test is not taken or does not confirm the officer's conclusions, the application of the protocol is a failure and should not be admitted into evidence. *State v. Sampson*, 6 P.3d 543, 557 (Or. Ct. App. 2000). The State, as the proponent of the testimony, bears the burden of establishing that the expert testimony satisfies the foundational requirements of Section 490.065.2(1) and, as relevant to this matter, that the expert's testimony is based on "reliable principles and methods which were reliably applied[.]" *State v. Antle*, 657 S.W.3d 221, 234 (Mo. App. W.D. 2021). The State cites no cases, from this or any other jurisdiction, allowing admission of DRE "expert" testimony where the protocol was not followed, and particularly where not a single step

in the protocol was followed.

The DRE in this case was allowed to testify as an expert witness over objection. The DRE testified as to his training on recognizing drug impairment and how he teaches other officers to recognize the effects of drugs on a person. The DRE in this case, however, was not the arresting officer, never interviewed the arresting officers or Schwarz, was unable to review a video of Schwarz's behavior at the scene because none existed, and was not at the scene of the offense; he formed his opinions based solely on his review of the written police reports of the arresting officers. Although he was labeled an "expert" before the jury and testified to his opinions, the DRE acknowledged during the offer of proof that, other than one pass of the HGN test, not a single step in the DRE protocol was completed, either by the expert or by the arresting officers. Instead, after reviewing the arresting officers' reports the DRE proceeded to opine that Schwarz was intoxicated by an inhalant, namely gasoline. The admission of this conclusion before the jury was improper and is problematic for several reasons.

First, step three of the DRE protocol requires the DRE to rule out intoxication by alcohol **or other medical impairments**. The DRE testified during the offer of proof that the DRE protocol requires a "medical rule-out" because what they are seeing may not be drug impairment but actually a medical issue. The DRE, however, failed to rule out any medical impairments. On the contrary, he ignored evidence alerting the arresting officers to the possibility that Schwarz suffered from untreated mental illness. The call to police by the concerned resident, S.B., informed dispatch that S.B. believed Schwarz was either

**5**

on drugs or having mental problems. S.B., a former drug-user himself, apparently did not find Schwarz's behavior entirely consistent with drug use alone. Then when the arresting officers made contact with Schwarz, Schwarz informed the officers that he had bipolar disorder and schizophrenia and that he was not taking his prescribed medications to treat these conditions. The arresting officers did not factor the possibility of reported mental illness into their conclusion that Schwarz was intoxicated from inhaling gasoline, and the DRE did not consider the statements either, despite the DRE protocol's demand that medical impairments be ruled out before an opinion of drug impairment is made and despite the DRE's testimony that mental illness could "mimic" drug intoxication. The main component of the foundation of the DRE's expertise, the DRE protocol, was not followed, yet the DRE was held out to be an expert before the jury and was allowed to present his opinions as scientifically validated. The DRE was allowed to testify to the jury that he is "the subject matter expert as deemed by the State on these topics".

The majority opinion essentially finds that the DRE was providing primarily non-specific, generalized testimony. This is simply not an accurate statement based on this record. Although the DRE did testify generally as to some effects of inhalants like gasoline, the DRE was allowed to testify that, in his expert opinion, Schwarz was intoxicated by an inhalant at the time of his arrest. And while the majority cites authority stating that "[i]f the expert purports to apply principles and methods **to the facts of the case**, it is important that th[e] application be conducted reliably[,]" it does not acknowledge the trial court wholly failed to hold the expert to the proper application of

**6**

his own required protocol. We would not allow a medical examiner to testify as to a cause of death if no autopsy had been performed, or a fingerprint expert to testify as to a fingerprint match if the expert failed to follow the proper scientific protocol to make such a determination, or even allow an expert to testify regarding the presence of blood based on positive luminol tests without a confirmatory test. *See State v. Daniels*, 179 S.W.3d 273, 285 (Mo. App. W.D. 2005). It was the State's burden to prove the expert testimony was based on reliable scientific principles and methods and that those principles and methods were reliably applied before that testimony was admitted. Section 490.065. The State clearly failed to do so. The majority further states that the expert's testimony "should be tested by the adversary process with . . . cross-examination, rather than [be] excluded by the court at the outset." However, Schwarz was not allowed to cross-examine the DRE with statements indicating that Schwarz may have an untreated mental illness, because the trial court compounded its error by excluding those statements on the mistaken conclusion that they were self-serving hearsay.

I would also have found that the excluded statements from S.B. that Schwarz appeared to be suffering from some mental condition and from Schwarz himself that he suffered from bipolar disorder and schizophrenia and that he was off of his medications were plainly and erroneously excluded from evidence. The statements were not, as the trial court concluded, self-serving hearsay; indeed, they are not hearsay at all, as Counsel argued at trial. The statements were not introduced to prove the truth of the matter stated, but were, instead, relevant as to the effects they had on the subsequent actions and

7

conclusions of the arresting officers and the DRE.[1]  The law is well established in Missouri that out-of-court statements are not hearsay when they are admitted to show the subsequent actions of law enforcement.  *See, e.g., State v. Hollowell*, 643 S.W.3d 329, 337 (Mo. banc 2022); *State v. Burroughs*, 627 S.W.3d 69, 78 (Mo. App. E.D. 2021); *State v. Allison*, 326 S.W.3d 81, 90 (Mo. App. W.D. 2010).  One arresting officer, P.B., testified before the jury that his conclusions that Schwarz was intoxicated were based in part on "my dispatch telling me what they had been advised by the concerned citizen" and Schwarz's "statements during this investigation up to that point."  Whether Schwarz in fact had bipolar disorder or schizophrenia and whether he was in fact not taking prescribed medication are beside the point; the possibility that Schwarz was experiencing mental health issues at the time of the stop, of which the officers had been informed by two different sources, should have had some bearing on their subsequent actions and should have at least been considered when they determined that Schwarz was impaired due to inhaling gasoline.  Step ten of the protocol requires the DRE to interview the individual (indicating that what the suspect states to the officer is relevant to the proper application of the protocol) and step three requires that medical impairment be excluded as the cause of the impairment.  It was the State's burden to show the causal connection

---

[1] While the non-hearsay argument was made at trial, on appeal, Schwarz relies on present-sense exception and the rule of completeness as bases for his claims that this evidence was erroneously excluded.  Because the non-hearsay argument is not in Schwarz's points on appeal, I make clear that I would reverse based on the erroneously admitted "expert" testimony.  However, at the very least, this evidence, even if not admitted as substantive evidence, should have been allowed for the purposes of cross-examining all of the State's witnesses.

between the intoxicating substance and the resulting impairment. *Pickering*, 473 S.W.3d at 704.It was the DRE's obligation to follow the protocol and "rule-out" a medical condition being the cause of the impairment. At the very least, the officers should have been cross-examined with these statements to make the jury aware of the process they followed or failed to follow in arriving at their conclusions.

The DRE in this case was allowed to consider and testify regarding all of the additional statements made by the eyewitness and by Schwarz except for the statements regarding the potential for mental illness being a possible or contributing cause to his behavior at the time of his arrest. The DRE testified he relied on the reports of the arresting officers but was allowed to exclude from his (and subsequently the jury's) consideration that those same reports reflected that Schwarz had bipolar disorder and schizophrenia and was prescribed medication to treat these mental health issues but was currently not taking those prescribed medications. (Tr. 166). The officers' reports also indicate the eyewitness believed Schwarz was either on drugs **or having a mental issue**. This evidence was not presented to the jury, even though the DRE testified in the offer of proof that mental illness can mimic drug intoxication. (Tr. 166).

Finally, I find that Schwarz was prejudiced by the trial court's errors. When the DRE was providing general background testimony, as opposed to improperly admitted expert testimony, about the non-utilized DRE protocols pertaining to the specific facts of the case, many of the stated effects of gasoline when used as an inhalant were either not observed by the arresting officers or could easily be explained by other facts. For

**9**

example, Schwarz was observed to have been fidgety or twitching in his whole body, which the DRE characterized as "body tremors," but Schwarz had been observed standing outside of his vehicle in sub-zero temperatures ("double digits below zero wind chill"), so it would be reasonable for a jury to consider whether this may have been shivering from the cold.  And while officers noted an overwhelming odor of gasoline, Schwarz reported needing to fuel his vehicle, and he was found sitting with an open gas can in his lap, which a jury could reasonably believe may have spilled or leaked onto his clothing causing the overwhelming odor, particularly since the officers were unable to determine if the odor of gasoline was on his person or coming from his breath.  Schwarz's eyes were red, but, again, this could arguably be the result of his sitting in an enclosed vehicle with an open gas container and gasoline on his clothing.

In addition, the expert testified that "he had encountered one woman who had been huffing gasoline and that she was by far the most impaired person he had ever dealt with and it had taken her hours to come back around."  (Internal quotation omitted).  However, this is in no way similar to what the officers reportedly observed of Schwarz; no one testified that he was "by far the most intoxicated person" they had ever encountered or that it took him hours to come back around.  Indeed, if he were suffering from untreated mental illness instead of intoxication, he might not be expected to come back around at all, and there was no evidence presented as to how long he was held or if his behavior ever changed during his confinement.  Case authority states that "the evidence [of drug intoxication] must relate to the particular substance involved."  *State v. Meanor*, 863

**10**

S.W.2d 884, 888 (Mo. banc 1993); there is no evidence that Schwarz was acting at all similar to the **one** person intoxicated by inhaling gasoline that the expert testified he had previously encountered.

Officers did not check Schwarz's gas gauge or take steps to determine whether he actually did need gas as he told the officers or whether the odor could have been from a spill and not from huffing the gasoline as argued by the State. Based on the arresting officer's testimony, Schwarz also lacked many of what the DRE testified were indicators of intoxication from inhaling gasoline including the inability to speak, nausea, flushed face, and dilated pupils. (Tr. 250). The main justifications given for the DRE's opinion that Schwarz was intoxicated from inhaling gasoline were his nonsensical and inappropriate statements (which the DRE did not and the jury was not allowed to consider as possibly having arisen from any mental illness), and the overwhelming aroma of gasoline.

It was the State's burden to show the causal connection between the intoxicating substance and the resulting impairment. *Pickering*, 473 S.W.3d at 704. The excluded evidence would have provided Schwarz a reasonable argument that the behaviors he exhibited were not as a result of the consumption of an intoxicating substance, but as a result of untreated mental illness.

Importantly this is not a sufficiency case; there was sufficient evidence from which the jury could have found Schwarz was intoxicated due to inhalants even absent the "expert" testimony. The majority cites the standard for prejudice, but then analyzes

**11**

the evidence as though it were a sufficiency case.  Basically, the majority contends that, even without the improperly admitted expert testimony, there was sufficient evidence to convict.  This is not the test our precedent indicates we should apply.  The trial court admitted the evidence that was consistent with the State's theory of the case, but excluded the evidence that was consistent with the defense's theory of the case, even for the purposes of cross-examining each of the State's witnesses.  While by no means am I suggesting that Schwarz could not have been convicted on the properly admitted evidence, there is a reasonable probability that the jury would not have found Schwarz guilty had the DRE "expert" testimony been properly excluded, which is the test of whether the erroneously admitted and excluded evidence was prejudicial.  *See Savick*, 347 S.W.3d at 154.

For these reasons, I respectfully dissent and would reverse the conviction and remand for a new trial.

_____
Gary D. Witt, Judge

**12**